UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE GENETICALLY MODIFIED RICE LITIGATION | ) ) | Case No. 4:06MD1811 CDP ALL CASES |

**MEMORANDUM AND ORDER**

Defendant Bayer AG has filed a motion to dismiss the claims against it for lack of personal jurisdiction. Having reviewed the briefs and extensive documentary evidence submitted by the parties, I conclude that plaintiffs have adequately shown a relationship between Bayer AG and its corporate subsidiaries, such that jurisdiction over Bayer AG in this case is proper. I will therefore deny Bayer AG's motion to dismiss.

## I. Introduction

In this multi-district litigation proceeding, plaintiffs allege that the defendants developed and mishandled a genetically-modified strain of rice that contaminated the U.S. rice supply. The majority of plaintiffs are U.S. long grain rice producers who reside in five U.S. states where rice is produced (Arkansas, Louisiana, Mississippi, Missouri and Texas). Most of the defendants are corporate entities affiliated with or owned directly or indirectly by Bayer AG, a German corporation headquartered in Leverkusen, Germany.

Three defendants in particular, Bayer AG, Bayer CropScience AG, and Bayer BioScience NV ("the foreign defendants"), filed a motion to dismiss plaintiffs' claims against them for lack of personal jurisdiction. Bayer AG is the primary Bayer entity that owns and oversees the Bayer enterprise. Bayer CropScience AG is a corporate subsidiary and, like Bayer AG, is a German corporation. Bayer BioScience NV is a Belgian corporation owned indirectly by Bayer CropScience AG (and thus, by extension, owned by Bayer AG).

After initially joining in the motion to dismiss, Bayer CropScience AG and Bayer BioScience NV conceded that this court has specific jurisdiction over them in this case.[1] Bayer AG continues to assert its jurisdictional challenge.

## II. Background Facts

Plaintiffs' master consolidated complaint was served on nine defendants, all of whom are Bayer entities.[2] Of these defendants, all but the three foreign defendants are U.S. corporations. Plaintiffs allege that one defendant in particular,

---

[1]These defendants do not concede general jurisdiction.

[2]Specifically, the named and served defendants are: Bayer AG; Bayer CropScience AG; Bayer BioScience NV; Bayer CropScience LP; Bayer CropScience Holding, Inc.; Bayer CropScience LLC; Bayer CropScience, Inc.; Bayer Corporation; and StarLink Logistics, Inc. A tenth entity, Bayer CropScience GmbH, was also named in the complaint, however this entity was subsequently merged into Bayer CropScience AG, and no longer exists as a separate and distinct party. Other parties in this MDL who are not named plaintiffs in the master complaint have also sued additional parties not affiliated with Bayer.

Bayer CropScience LP, is the party that "itself and through its parent, subsidiary, affiliated and predecessor entities . . . produces or has produced the genetically-modified rice seeds" at issue in this case. CropScience LP is a Delaware limited partnership with its principal place of business in North Carolina. The general and limited partners with an ownership interest in CropScience LP have also been named as defendants, and are themselves domestic Bayer entities.

Plaintiffs set forth various allegations relating to each of the foreign defendants. Bayer BioScience NV is a wholly owned subsidiary of Bayer AG and is engaged primarily in bioscience research. According to plaintiffs, BioScience NV is "one of the main innovation and research centers for Bayer," and is the recorded assignee of several U.S. patents relating to genetically modified rice.

Bayer CropScience AG, according to defendants, "operates the Bayer cropscience business." Plaintiffs allege that CropScience AG engages in the "research, manufacture, testing, marketing and sale of agricultural chemicals and technologies." According to the complaint, CropScience AG assumed the liabilities of a former Bayer entity, Bayer CropScience GmbH. CropScience GmbH contracted with Louisiana State University to perform field testing of the genetically modified rice seeds at issue here.

Both BioScience NV and CropScience AG have conceded specific

jurisdiction in this case. Bayer AG is the only remaining foreign defendant who contests jurisdiction. Bayer AG describes itself as a "management holding company" that owns and oversees over 350 entities worldwide. Bayer AG determines long-term strategy for its holdings and sets guidelines and principles for its operating companies and subsidiaries. The principal operating subsidiaries overseen by Bayer AG are Bayer CropScience AG, Bayer HealthCare AG, and Bayer MaterialScience AG. The defendants in this case are assigned to the CropScience AG subsidiary.

Bayer's current organizational structure was put into place in 2002 and 2003. Originally, many of the Bayer companies involved in this suit were corporate entities that operated under the name Aventis. According to plaintiffs, the original project (referred to as "LLRICE") was begun by a company named AgrEvo USA in 1998. AgrEvo USA was owned by a European company, Hoescht AG. Hoescht later merged with another company, Rhone-Poulenc SA, to form Aventis SA. Aventis was the corporate parent of several entities, among them Aventis CropScience USA LP, Aventis CropScience GmbH, Aventis CropScience NV, and Aventis CropScience Holding SA.

In June 2002, Bayer AG acquired Aventis. Eventually, Bayer re-named and re-structured the Aventis companies into the Bayer entities named in this suit.

Additionally, around this same time Bayer underwent a corporate reorganization of its own. In 2002 and 2003, Bayer ceased to be an operational company and transferred its operations to its current three primary subgroups. The purpose of this reorganization, according to Bayer, was to "separate strategic oversight from operational management, with Bayer AG providing strategic guidance, while legally independent subsidiaries operate the respective businesses."

Bayer AG asserts that it has never engaged in the cropscience business in its own name. Before the acquisition of Aventis, Bayer had no cropscience operations. Once Aventis was acquired, Bayer AG was no longer an operational company. Throughout this acquisition and restructuring period, the LLRICE project continued – first through companies under the name Aventis CropScience, and later under the name Bayer CropScience.

Plaintiffs point to several instances of overlap between domestic defendant Bayer CropScience LP and the foreign defendant Bayer CropScience AG. Board members and chairpersons of the two companies often overlapped, and management personnel transferred positions between the companies. Reporting requirements were often complex, with Bayer CropScience LP officials reporting to Bayer CropScience AG management. Plaintiffs allege numerous facts that establish Bayer CropScience AG was involved with the LLRICE project through

its overlap and cooperation with Bayer CropScience LP.

In contrast to the situation with Bayer CropScience AG, plaintiffs do not allege that the management holding company Bayer AG had any direct participation in the LLRICE project. Likewise, plaintiffs do not allege any instances of overlap between personnel of Bayer AG and the domestic defendant Bayer CropScience LP. Rather, plaintiffs set forth two theories whereby Bayer AG would be subject to the jurisdiction of this court.

In the first theory, plaintiffs allege that Bayer AG has sufficient minimum contacts with the forum state (Missouri), such that Bayer AG is subject to general jurisdiction in this case.[3] Plaintiffs point to three types of contacts in particular.

First, plaintiffs state that Bayer AG has availed itself of the Missouri forum on two occasions, by filing two lawsuits in Missouri federal courts in 1998 and 1999. These patent suits were unrelated to the LLRICE project, and were litigated when Bayer AG was an operational entity, before its reorganization as a management holding company.

Second, plaintiffs argue that Bayer AG conducted business in Missouri by entering into a non-disclosure agreement with a Missouri company in 2003

---

[3]Plaintiffs do not allege any minimum contacts with the other states central to this litigation. The parties dispute the significance of this fact. *See infra* Part III.A.2.

regarding tobacco research. After the Bayer corporate reorganization, however, Bayer HealthCare AG was substituted as the Bayer entity that was party to that agreement. Bayer AG argues that is no longer party to this non-disclosure agreement, and in fact does not carry on business in Missouri under its own name, as it is strictly a management holing company.

Finally, plaintiffs argue that Bayer AG stock was listed until last year on the New York Stock Exchange. As such, plaintiffs claim this stock was available to and purchased by Missouri residents. This fact, according to plaintiffs, constitutes a "contact" with Missouri for purposes of jurisdiction. Taken together, plaintiffs argue that under a totality of the circumstances test, the two lawsuits, the non-disclosure agreement, and the stock listing establish "continuous and systematic minimum contacts" with Missouri.

Alternatively, plaintiffs argue that Bayer AG should be subject to jurisdiction as the corporate alter ego of the other Bayer defendants. Plaintiffs point to Bayer AG's own statements, contained in publications sent to shareholders, showing that Bayer AG is more than a mere corporate parent. Bayer describes itself as a "single unified global enterprise," and refers to its various

operations as "subgroups."[4] The four-person management board of Bayer AG oversees and coordinates the Bayer operations throughout the world. In particular, plaintiffs point to two instances where Bayer AG appointed a director and chairman to the board of the U.S. company Bayer CropScience LP.[5]

The Bayer entities also have a unified financial structure. Bayer AG guarantees the debts of its subsidiaries to third parties, and dividends from the Bayer entities are distributed exclusively to Bayer AG. Bayer uses a uniform system for making internal payments and moving money between accounts among the various Bayer companies. Bayer AG files a single consolidated tax return in the U.S., as well as single integrated SEC filings for all its enterprises. Bayer carries a single insurance policy to cover its companies and the claims here. Plaintiffs also note that Bayer AG requires its corporate subsidiaries to use the name "Bayer" when representing themselves to outside companies, and all Bayer entities use the same uniform corporate logo. In internal documents and letters to

---

[4]Not all companies listed under each subgroup are a part of that group's chain of ownership. For example, Bayer CropScience LLC, a defendant in this lawsuit, is a member of the cropscience subgroup. However Bayer CropScience AG, the leading corporate entity of the subgroup, has no ownership interest in CropScience LLC.

[5]The parties dispute whether the evidence shows that Bayer AG actually "appointed" these officials. The document in question is written in German and uses the German word "befurwortet." Plaintiffs translate this term as "appointed," and Bayer did the same in at least one contemporaneous internal document. Defendants now argue, however, that it should properly be read to mean that Bayer AG merely "supported" the appointments.

shareholders, Bayer refers generally to itself as "we," "us," and "our."

Finally, plaintiffs point to a 2002 Control and Profit Transfer Agreement signed by the board of directors of both Bayer AG and Bayer CropScience AG. Under the agreement, CropScience AG "subordinates the management of its company" to Bayer AG. The purpose of this agreement is to allow Bayer "to harmonize the specific interests of [CropScience AG] with those of Bayer and the interests of the entire group of companies." Under the agreement, Bayer AG is entitled to give instruction to the CropScience AG board regarding the management of its company. Additionally, CropScience AG "undertakes to transfer its entire profit" to Bayer AG. In turn, Bayer AG is bound to assume any loss incurred by CropScience AG. CropScience AG is also empowered under the agreement to consolidate its own companies, and may surrender its own operations to subsidiaries while maintaining managerial oversight.

## III. Discussion

"A federal court in a diversity action may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004). In Missouri the long-arm statute providing for jurisdiction over foreign defendants is Mo. Rev. Stat. 506.500. The statute asserts

jurisdiction over a defendant transacting "any business within the state," and Missouri courts have held that this language reaches to the fullest extent permitted by the Due Process clause. Mo. Rev. Stat. 506.500; *Sloan-Roberts v. Morse Chevrolet, Inc.*, 44 S.W.3d 402, 409 (Mo. App. 2001); *Scullin Steel Co. v. National Railway Utilization Corp.*, 676 F.2d 309, 311 (8th Cir. 1982) (citing *State ex rel. Deere & Co. v. Pinnell*, 454 S.W.2d 889, 892 (Mo. 1970)). Therefore, I will limit my inquiry to a determination whether general jurisdiction over Bayer AG is consistent with due process.

Due process requires that a defendant have sufficient minimum contacts with the forum state, such that the exercise of jurisdiction would not offend notions of fair play and substantial justice. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980). Attention must be paid to the quality and nature of the contacts, as well as to whether the defendant, through those contacts, enjoyed the "benefits and protections" of the laws of the foreign state. *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). A defendant's contacts with the state must be sufficient so as to cause the defendant to "reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297.

A. <u>General Jurisdiction</u>

The Supreme Court has recognized two types of contacts that can satisfy the demands of due process. A court may assert jurisdiction over a foreign defendant under a theory of general jurisdiction or specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). When the cause of action directly arises out of the defendant's contacts with the forum state, the defendant will be brought into court under specific jurisdiction. *Helicopteros*, 466 U.S. at n.8; *Burlington Industries, Inc. v. Maples Industries, Inc.*, 65 F.3d 1427, 1432 n.4 (8th Cir. 1995). Alternatively, if the defendant has an ongoing presence in the state through systematic and continuous contacts, the court may assert general jurisdiction. *Helicopteros*, 466 U.S. at 414. Here, plaintiffs argue that Bayer AG is subject to the general jurisdiction of this court.

A defendant's contacts with the forum state must be more than "random, fortuitous or attenuated." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The Eighth Circuit has instructed courts to consider five factors when determining whether personal jurisdiction over a foreign defendant is proper: (1) the nature and quality of contacts with the forums state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the

parties. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073-74 (8th Cir. 2004); *Burlington Industries*, 97 F.3d at 1102. The first three factors are given significant weight in the analysis. *Dever*, 380 F.3d at 1074.

1. Contacts with Missouri

Plaintiffs point to three specific contacts to establish that Bayer AG has a systematic and continuous presence in Missouri. First, plaintiffs note that Bayer AG entered a contract with a Missouri corporation in 2003. Second, Bayer AG availed itself of Missouri courts by filing two patent infringement suits in the Western District of Missouri in 1998 and 1999. Finally, Bayer AG until last year listed its stock on the New York Stock Exchange, where it was available for purchase by Missouri residents.

Plaintiffs' arguments do not support the exercise of general jurisdiction over Bayer AG. Plaintiffs have not produced any evidence to suggest that Bayer AG's presence in the state was anything more than "random or fortuitous." A single contract entered into with a Missouri corporation and two lawsuits filed in Missouri are not "systematic." Moreover, the contract to which plaintiffs point is a particularly weak basis for jurisdiction, given that Bayer AG was only party to it for six months before substituting a corporate subsidiary in its place. Courts considering similar bases for jurisdiction have likewise concluded that these types

of attenuated contacts are not sufficient. *See Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir. 2006) (publishing relationship with a forum company not sufficient to confer jurisdiction); *Scullin Steel Co. v. Nat'l Ry. Utlization Corp.*, 676 F.2d 309, 313 (8th Cir. 1982) ("Merely entering into a contract with a forum resident does not provide the requisite contacts between a defendant and the forum state."); *Brokerwood International v. Cuisine Crotone, Inc.*, 104 Fed. Appx. 376, 382 (5th Cir. 2004) (sending three demand letters and filing one lawsuit insufficient to support jurisdiction). Plaintiffs' proposed "contact" with Missouri through the listing on the New York Stock Exchange is not actually a contact with Missouri at all. *See Action Mfg. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 426 (E.D. Pa. 2005). Considering the nature and quality of these contacts, it would be unreasonable to hold that Bayer AG has a continuous presence in Missouri, such that it could be reasonably brought into a Missouri court on the basis of general jurisdiction. The three contacts presented by plaintiffs, considered either individually or as a whole, do not establish sufficient minimum contacts with the forum state.

2. Contacts with Other States

Plaintiffs do not argue that Bayer AG has sufficient minimum contacts with any of the other states in this MDL, and I have not been asked to consider whether

contacts with any of the other states would support jurisdiction. Bayer AG argues that contacts with other states are not relevant, because Bayer AG has only been served with one complaint – and that complaint was filed in Missouri. Thus, Bayer AG maintains it is not a party to any suit involving any other state, and only Missouri jurisdiction is at issue.

Plaintiffs respond by saying that all parties understood that the arguments raised and briefed here would be dispositive for all jurisdictional issues in the MDL. When Bayer AG failed to raise a jurisdictional challenge relating to other states, it thereby waived any such arguments, and consented to jurisdiction in every MDL state but Missouri.

I need not resolve this issue. For reasons set forth in Part III.B of this opinion, I decide the jurisdictional issues based on the contacts that Bayer CropScience AG has with each of the forum states and the relationship between CropScience AG and Bayer AG. Therefore, it is unnecessary for me to consider whether Bayer AG would, by itself, have sufficient minimum contacts with each of the four remaining states to support general jurisdiction.

B. Jurisdiction Based on the Contacts of CropScience AG

Bayer AG is not subject to general jurisdiction in this case. And plaintiffs do not argue that Bayer AG is itself subject to specific jurisdiction. Rather,

plaintiffs' second argument is that the contacts of the other Bayer entities giving rise to specific jurisdiction may be imputed to Bayer AG. Specifically, plaintiffs argue that the activities of Bayer CropScience AG may be attributed to Bayer, such that jurisdiction over Bayer AG is proper. I agree with this argument.

1. Specific Jurisdiction over CropScience AG

The parties agree that CropScience AG operates the Bayer cropscience enterprise and was involved in the development of LLRICE. According to plaintiffs, eleven current and former employees of CropScience AG (and CropScience GmbH, which merged into CropScience AG) worked on the LLRICE project during its development. In particular, Bernhard Schreiber, an employee of CropScience AG, served on the LLRICE core project team.

Through its employees' work on the project, CropScience AG had numerous contacts with each of the states in this MDL. CropScience GmbH entered a research contract with Louisiana State University for the field testing of genetically modified rice. Under the contract, field tests were performed in Arkansas, Louisiana, and Mississippi. Members of the rice project team, including Schreiber, discussed the possibility of marketing the genetically modified rice to numerous customers, including those in Missouri, such as Anheuser-Busch. The project team also made special trips to visit the field test

sites in Arkansas, Louisiana and Mississippi. During a meeting held in Texas, the project team developed a pilot project for marketing the rice. Representatives from Bayer and the project team eventually visited 17 rice mills in Arkansas, Louisiana, Mississippi, and Texas to gauge interest in the LLRICE project.

Throughout the LLRICE development, officials from Bayer CropScience LP and the other Bayer entities referred to Schreiber as a key decision maker. Donna Mitten of CropScience LP noted that Schreiber "ultimately pays for LLRICE development." In Germany, Schreiber was considered "the voice of this project."

Plaintiffs have thus made a sufficient showing that CropScience AG played a substantial role in developing LLRICE, and had numerous related contacts with the forum states. Presumably for this reason, CropScience AG has conceded specific jurisdiction in this case. Even if it had not done so, however, I would conclude that CropScience AG is subject to the specific jurisdiction of this court.

2. Relationship Between Bayer AG and CropScience AG

Having established that jurisdiction over Bayer CropScience AG is proper, plaintiffs next argue that the relationship between CropScience AG and Bayer AG

is such that Bayer AG should also be subject to jurisdiction.[6] Plaintiffs maintain that Bayer AG is a management holding company with the capacity to control and make decisions for CropScience AG. Though plaintiffs do not allege any "abuses" of the corporate form for the purpose of committing fraud or wrongdoing, they nevertheless argue it is appropriate to impute the contacts of CropScience AG onto Bayer AG for purposes of determining jurisdiction.

It is well-settled that a parent corporation is not subject to the personal jurisdiction of a state merely by the presence of its wholly-owned subsidiary. *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925); *Epps v. Stewart Information Services Corp.*, 327 F.3d 642, 649 (8th Cir. 2003). The Supreme Court has noted that a parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is "consistent with the parent's investor status." *United States v. Bestfoods*, 524, U.S. 51, 69 (1998); *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). Appropriate subsidiary involvement for a parent can include monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital

---

[6]Plaintiffs actually argue that the activities of all the Bayer entities may be imputed to Bayer AG, and that all the defendants are alter-egos of one another. I need not address this theory, as the relationship between Bayer AG and Bayer CropScience AG is sufficient to support jurisdiction over Bayer AG..

budget decisions, and articulation of general policies and procedures. *Bestfoods*, 524 U.S. at 69.

However, this is not to say that a corporate parent can never be subject to jurisdiction based on the conduct of its subsidiary. Where a subsidiary's "affairs are so conducted that it is in fact a mere instrumentality or adjunct of another corporation," jurisdiction over the parent may be proper. *Epps*, 327 F.3d at 649. "No all embracing rule has been laid down under which the relationship between two corporations may be determined. The circumstances in each case must be examined to determine whether a corporation through the activities of another corporation has subjected itself to jurisdiction." *Id*. (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.*, 519 F.2d 634, 637 (8th Cir. 1975).

Courts outside the Eighth Circuit have held that the determination whether to impute the jurisdictional contacts of one corporation onto another may take one of two forms. A corporate parent may subject itself to jurisdiction either as an alter-ego of the subsidiary, or by having the subsidiary act as its agent. *See, e.g., Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001); *Bellomo v. Penn. Life Co.*, 488 F. Supp. 744 (S.D.N.Y. 1980). The Ninth Circuit's decision in *Doe* is particularly instructive. To demonstrate that two corporations are alter-egos of one another, a

plaintiff must demonstrate (1) there is such a unity of interest and ownership that the separate entities no longer exist; and (2) failure to disregard the separate identities would result in fraud or injustice. *Doe*, 248 F.3d at 926. *See also, Harris Rutsky & Co. Ins. Serv., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003). This test is satisfied where "the record indicates that the parent dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." *Doe*, 248 F.3d at 926-27 (citing *Rollins Burdick Hunter of Southern Calif., Inc. v. Alexander and Alexander Serv., Inc.*, 253 Cal. Rptr. 338 (Cal. Ct. App. 1988)). *See also Lakota Girl Scout Council*, 519 F.2d at 638 ("Where a corporation is the alter ego of the stockholders so as to justify disregard of the corporate entity, jurisdiction over the corporation will support jurisdiction over the stockholders.").

Alternatively, where the alter-ego test is not used, a court may rely on the agency test to subject the corporate parent to jurisdiction. The agency test is satisfied "by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" *Doe*, 248 F.3d at 928 (citing *Chan v. Society Expeditions*, Inc., 39 F.3d

1398, 1405 (9th Cir. 1994)). *See also, Harris Rutsky & Co.*, 328 F.3d at 1135 (Subsidiary was "either established for or is engaged in activities that but for the existence of the subsidiary, the parent would have to undertake itself.").

An agency relationship is distinguishable from that of a traditional holding company and its subsidiary. In the case of a holding company, the parent "could simply hold another type of subsidiary, in which case imputing the subsidiaries' jurisdictional contacts to the parent would be improper." *Doe*, 248 F.3d at 929 (citing *Gallagher v. Mazda Motor of America, Inc.*, 781 F. Supp. 1079 (E.D. Pa. 1992)). The Southern District of New York made the distinction as follows:

> Where a holding company is nothing more than an investment mechanism, a device for diversifying risk through corporate acquisitions, the subsidiaries conduct business not as its agents but as its investments. The business of the parent is the business of investment, and that business is carried out entirely at the parent level. Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, to carry on business on its behalf, there is no basis for distinguishing between the business of the parent and the business of its subsidiaries.

*Bellomo*, 488 F. Supp. at 746. *See also Gonzalez v. Internacional de Elevadores*, S.A., 891 A.2d 227, 239 (D.C. 2006) (quoting *Curtis Publishing Co. v. Cassel*, 302 F.2d 132, 137 (10th Cir. 1962)) ("As all corporations must necessarily act through agents, a wholly owned subsidiary may be an agent when its activities as an agent are of such a character as to amount to doing business of the parent, the

parent is subjected to the in personam jurisdiction of the state in which the activities occurred.”).

Not all circuit courts have drawn the distinction between alter-ego jurisdiction and agency jurisdiction. The Fifth Circuit in *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763 (5th Cir. 1988) specifically rejected the approach spelled out in *Bellomo* and the Ninth Circuit. “In [the Fifth] Circuit, it is established that so long as a parent and a subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other.” *Id*. at 774 n.18. The Eighth Circuit has neither explicitly endorsed nor rejected the formulation of the agency test set forth in *Bellomo*. However, unlike in the Fifth Circuit, the attribution of jurisdictional contacts is not limited to situations where a subsidiary’s corporate veil can be pierced under state law. *See Anderson v. Dassault Aviation*, 361 F.3d 449, 452 (8th Cir. 2004).

In the Eighth Circuit, “determining the propriety of jurisdiction at a particular place always involves applying principles of fairness and reasonableness to a distinct set of facts, and the determination is not readily amenable to rigid rules that can be applied across the entire spectrum of cases.” *Id*. In some cases, the court has noted that an agency relationship may be significant in determining the propriety of jurisdiction. *See Romak USA, Inc. v. Rich*, 384 F.3d 979, 985 (8th

Cir. 2004) (noting that a court may exercise jurisdiction over a defendant through the acts of his agent); *Clune v. Alimak*, 233 F.3d 538, 547 (8th Cir. 2000) (Bright, J., concurring) (noting the significance of a controlling relationship in which, without the existence of its subsidiaries, the parent would be unable to carry out its business). In other cases, the Eighth Circuit has held that the alter-ego test can be a flexible one. *See Epps*, 327 F.3d at 649 ("Conditions under which a corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case."). If one general principle can be gleaned from these cases, however, it is that an alter ego or agency relationship is "typified by parental control of the subsidiary's internal affairs or daily operations." *Doe*, 248 F.3d at 926.

With these principles in mind, I turn now to the relationship between Bayer AG and Bayer CropScience AG. Bayer AG describes itself as a management holding company. According to Bayer, it has established its current corporate structure so as to "separate strategic oversight from operational management." Nevertheless, Bayer as a whole continues to see itself as a "single unified enterprise."

There are many aspects of the Bayer corporate structure that are not unusual for a traditional parent-subsidiary relationship. Bayer monitors performance and

supervises the finances of its subsidiary corporations. Bayer entities all use the same logo and corporate name, and frequently refer to themselves as “we,” “us,” and “our.” Bayer files a single consolidated tax return for all its entities, and uses a unified internal accounting system to keep track of payments and receipts between its corporations. These facts are relevant to the jurisdictional analysis, but they do not establish that CropScience AG is the agent or alter-ego of its parent. These facts alone do not justify attributing the jurisdictional contacts of CropScience AG to Bayer AG.

This, however, is not the end of the analysis. The facts show that while Bayer AG and CropScience AG may observe all corporate formalities, their relationship goes beyond that of a normal parent and subsidiary. The situation presented here is not unlike the cases presented in *Anderson v. Dassault Aviation*, 361 F.3d 449 (8th Cir. 2004).

In *Anderson*, a foreign defendant, Dassault Aviation, was held subject to federal jurisdiction in Arkansas based on the contacts of Dassault’s corporate subsidiary, Dassault Falcon Jet. The parent corporation manufactured jet aircraft that were later sold in this country by the subsidiary. *Id*. at 451. Though the parent corporation itself was not directly present doing business in Arkansas, the Eighth Circuit nevertheless concluded that the subsidiary’s contacts could be

attributed to the parent. The two corporations had a "close, synergetic relationship that is not an abuse of the corporate organizational form, but is clearly relevant to the jurisdictional question." *Id*. at 453. As in the case of Bayer, the two corporations used the same name and logo and purposefully "unif[ied] the efforts of both Dassault Aviation and Dassault Falcon Jet to create this brand and logo image." *Id*. at 454. Because the parent had a "clear awareness of and interest in its subsidiary's substantial operations in Arkansas," jurisdiction over the parent was proper.[7] *Id*. at 453.

Here, as in *Anderson* and *Daimler-Benz*, the two corporate defendants Bayer AG and Bayer CropScience AG have a close, synergetic relationship. The corporate parent serves to provide guidance and set policy. The subsidiary's

---

[7]Plaintiffs also point to *Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W. 3d 707 (Tex. Ct. App. 2000) as another analogous case. In *Daimler-Benz*, the Texas Court of Appeals held that a foreign parent (Daimler-Benz) was subject to jurisdiction based on the contacts of its domestic subsidiary (MBNA). The court noted:

> Although Daimler-Benz strictly observes corporate formalities, MBNA essentially connects Daimler-Benz to markets in the U.S., including Texas. Daimler-Benz holds itself out to investors as a corporation that does business in all corners of the globe. MBNA's classification as a sales company demonstrates that its function is to generate sales for Daimler-Benz. . . . Daimler-Benz also exercises significant functions for MBNA and its other subsidiaries, such as obtaining financing and coordinating purchasing. Further, the management of Daimler-Benz closely supervises and directs the activities of its subsidiaries. Thus, while formally separate, Daimler-Benz and MBNA form a functional whole in promoting and marketing vehicles in Texas.

*Id*. at 722-23.

purpose is to carry out the directives of the parent and fulfill its obligations within the Bayer enterprise. Without the existence of one, the other lacks a key aspect of its essential make-up. Bayer benefits from marketing itself as a single, unified enterprise. As such, CropScience AG acts as a "mere instrumentality or adjunct" of the larger corporate parent.

The structure established by Bayer is more than that of a typical holding company. Unlike the holding companies referred to in *Bellomo*, Bayer AG's business is not strictly limited to investment. It is not an "investor" while its subsidiaries are "operators." *See Bellomo*, 488 F. Supp. at 746; *Lyons v. Phillips Morris Inc.*, 225 F.3d 909, 915 (8th Cir. 2000). Bayer AG is a *management* holding company, with the power to directly manage its subsidiaries. The profit and control transfer agreement in place between Bayer AG and CropScience AG specifies that "[CropScience AG] subordinates the management of its company to Bayer." Bayer is "entitled to give instruction to [CropScience AG's] Board of Directors regarding the management of the company." Moreover, CropScience AG "undertakes to transfer its entire profit to Bayer." Thus any benefit accruing as the result of any alleged misdeed involving rice would flow directly to the corporate parent. When CropScience AG participated in the LLRICE project, it established minimum contacts not only for itself, but also for

Bayer AG – the company that oversaw and had the power to manage its subsidiary.

Bayer's corporate structure attempts to place the primary entity providing direction for Bayer activities beyond jurisdictional reach. Bayer AG continues not merely to "invest in," but to manage and direct the Bayer enterprise as a whole, while claiming legally independent status. Indeed, given the defendants' interpretation of Bayer AG's structure, it is difficult to conceive how Bayer AG – a company that oversees the operations of over 350 entities worldwide – would ever be subject to jurisdiction anywhere but in its own back yard. In fact, under the profit and control transfer agreement, CropScience itself has the authority to set itself up as a management holding company and delegate operations to yet a lower subsidiary. Under the defendants' theory, the actual business of the company becomes artificially nested inside an endless progression of Russian dolls.

In its Form 20-F filing with the SEC (a single regulatory filing meant to apply to all Bayer entities), Bayer AG describes its operations as occurring in three subgroups: Bayer HealthCare, Bayer CropScience, and Bayer MaterialScience. According to Bayer:

The subgroup management companies Bayer HealthCare AG, Bayer

> CropScience AG, and Bayer MaterialScience AG, heading up the three subgroups, manage the business activities of the domestic and foreign affiliates assigned to them. Each subgroup is, within the framework of strategies, goals and guidelines determined by the Bayer AG Board of Management, an independent operating area with worldwide business accountability and its own management. Each of the subgroup management companies has entered into a domination and profit and loss transfer agreement with Bayer AG.

That each subgroup has its own management board cannot be denied. But claiming these groups are "independent operating areas" does not make it so. The control and profit transfer agreements are clear. The groups are "independent" only to the extent that Bayer AG allows them to be. Bayer AG still manages the managers. That is why Bayer AG exists.

This is not to say that the hundreds of Bayer entities worldwide can be co-mingled and thought of interchangeably. The corporate separateness between Bayer AG and CropScience LP, for example, remains distinct. But Bayer AG acts through its CropScience subgroup and Bayer CropScience AG. For that reason, the jurisdictional contacts of CropScience AG should be attributed to Bayer AG. Because CropScience AG has sufficient minimum contacts with the forum states to support jurisdiction, Bayer AG has these contacts as well.

C. Considerations of Fair Play and Substantial Justice

"Once it has been decided that a defendant purposefully established

minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). In appropriate cases, courts may evaluate "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Id*. at 477 (citations omitted). It is important to note that these considerations "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id*. (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)).

The case presented here is an MDL proceeding representing the consolidation of hundreds of individual cases across five states. Plaintiffs assert a multitude of claims for damages, all stemming from the alleged conduct of Bayer CropScience LP, Bayer CropScience AG, and the oversight and direction provided by Bayer AG. Missouri and the other states represented in this MDL have a significant interest in seeing that plaintiffs' claims are resolved justly. Particularly

in a case such as this one, where the corporate profits of CropScience AG flow directly up and are entirely subsumed by Bayer AG, the fairness and reasonableness of bringing Bayer AG to court is apparent.

Bayer AG has sufficient minimum contacts with the forum states in this MDL, based on its relationship with its subsidiary CropScience AG. In addition, asserting jurisdiction over Bayer AG would not offend notions of fair play and substantial justice. For these reasons, personal jurisdiction over Bayer AG is proper.

## IV. Scope of this Ruling

Finally, a word must be said about the scope of this jurisdictional ruling.[8] Bayer AG has thus far been served with only one complaint, that being the consolidated master class action complaint filed here in the Eastern District of Missouri. Presumably, once I lift the stay on amendment of pleadings in the tag-along cases, Bayer AG may be added as a defendant in many more plaintiff actions. This MDL proceeding was designed to avoid repetitive litigation, and the parties briefed these jurisdictional issues with the idea that they would be resolved dispositively in this court.

---

[8]Of course, this ruling is limited to the jurisdictional question: it has no effect on whether plaintiffs will ultimately be able to impose liability on Bayer AG.

"When a transferee court receives a case from the MDL Panel, the transferee court applies the law of the circuit in which it is located to issues of federal law." *In re General American Life Insurance Co. Sales Practices Litigation*, 391 F.3d 907, 911 (8th Cir. 2004). Conversely, when considering issues of state law, "the transferee court must apply the state law that would have applied had the cases not been transferred for consolidation." *Id*. What I have done here is to resolve the federal due process question raised by Bayer AG's jurisdictional challenge. I have done so in accordance with the law of the Eighth Circuit. I have not addressed the specific state law issues raised by the state long-arm statutes applicable to the various tag-along cases transferred from other judicial districts. However, the various state long-arm statutes do not present significant jurisdictional issues in this case. The applicable statutes of Arkansas, Texas and Louisiana confer jurisdiction to the fullest extent permitted by the due process clause. *See* Ark. Code Ann. § 16-4-101(B); *PHC-Minden, L.P. v. Kimberly-Clark Corp*., 235 S.W.3d 163, 166 (Tex. 2007); *A&L Energy, Inc. v. Pegasus Group*, 791 So. 2d 1266, 1270 (La. 2001). In addition, Bayer AG comes within the ambit of the Mississippi long-arm statute. *See Yatham v. Young*, 912 So. 2d 467, 470 (Miss.

2005).[9]

Therefore, this jurisdictional ruling applies to all the cases that make up this MDL. Bayer AG is subject to the personal jurisdiction of this court, as well as that of any federal transferor court to which a tag-along case might be returned. Bayer AG is foreclosed from challenging jurisdiction at a later date under any alternative theory not already presented. Fed. R. Civ. P. 12(g)(2).

## V. Conclusion

For all the reasons stated in this memorandum, Bayer AG's motion to dismiss for lack of personal jurisdiction will be denied. As Bayer BioScience NV and Bayer CropScience AG have already conceded personal jurisdiction, the motion will be denied in its entirety. Accordingly,

**IT IS HEREBY ORDERED** that the defendants' motion [#353] to dismiss for lack of personal jurisdiction is DENIED.

The following motions are also DENIED:

[#557] in Case No. 4:06MD1811 CDP

---

[9]The Supreme Court of Mississippi holds that a foreign defendant comes within the reach of the state's long-arm statute whenever there is a tort alleged to be committed in the state. *Yatham*, 912 So. 2d at 470. A tort is committed in Mississippi when the injury results in the state. *Id*. It is clear from their complaints that the Mississippi rice producers in this MDL allege an injury suffered in Mississippi. Therefore, if Bayer AG were to be served in a Mississippi case, the Mississippi long arm statute would be satisfied, and the only dispositive issue under Mississippi law would remain one of due process.

[#006] in Case No. 4:07CV1774 CDP

[#006] in Case No. 4:07CV1775 CDP

[#006] in Case No. 4:07CV1776 CDP

[#007] in Case No. 4:07CV1779 CDP

[#006] in Case No. 4:07CV1795 CDP

[#006] in Case No. 4:07CV1796 CDP

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of June, 2008.